UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEENA OTHMAN,<br><br>      Plaintiff,<br><br>  -against-<br><br>CITY OF NEW YORK, HUASCAR B.<br>MORELL, *and* JOHN DOE OFFICERS #1–10,<br><br>     Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT AND<br>JURY DEMAND** |

Plaintiff Deena Othman, by and through her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, for her Complaint alleges as follows:

### INTRODUCTION

1.   Deena Othman thought she would faint from hunger and exhaustion. She had been in NYPD custody for more than 24 hours. The police had not given her any food or water, nor let her sleep, since they barged into her home at 6:45 the prior morning, demanding her children find her. Ms. Othman had been sobbing on and off since she was first handcuffed. One officer had thrown away food in front of her so that she couldn't eat. Another forbade her from using the bathroom except with a male guard watching. Another stripped her of her hijab in front of a male officer and took her picture. Several had interrogated her about her and her family's religious practices. She still didn't understand why she was in custody. One of the officers had mentioned something about a theft in Midtown, but she had told them she never went to Manhattan.

2.   The NYPD's treatment of Ms. Othman during her arrest, booking, and detention manifestly violated Ms. Othman's religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), as well as the Fourth Amendment. This action seeks

damages for these violations to compensate Ms. Othman for the severe emotional damage she has suffered and continues to suffer.

## PARTIES

3.      Deena Othman is a citizen of New York and for all relevant times she resided in Staten Island, New York.

4.      Defendant Detective Huascar B. Morell, Shield #3801, at all times relevant hereto, was a police officer of the New York Police Department ("the NYPD"), acting in the capacity of agent, servant, and employee of the City of New York, and within the scope of his employment.  He is sued in his individual and official capacities.

5.      At all relevant times, Defendants NYPD Officers John Does # 1–10, names and shield numbers unknown to Plaintiff but known to the NYPD, were police officers in the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of their employment.  They are being sued under fictitious names because their names are unknown to Plaintiff at this time. They are sued in their individual and official capacities.

6.      Defendant City of New York ("the City") is a municipality organized and existing under the laws of the State of New York and is located within the confines of the Southern District of New York.  The NYPD is an agency of the City.  At all times relevant hereto, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD (and regulations of the NYPD Patrol

Guide), and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, and the Fourth and Fourteenth Amendments to the United States Constitution.

8.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in the District.

## JURY DEMAND

9.     Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

10.     At the time of her arrest, Deena Othman was 43 years old.  She was born and raised in New York.  She resides in Staten Island and is the mother of six children.  For the last seven years, she has worked for the Board of Education as a paraprofessional at a Kindergarten to 3rd grade school for children with special needs, R373, in Staten Island.

11.     Ms. Othman is also practicing Muslim.  She has observed the hijab since she was 13 years old, and she prays five times a day.

12.     Ms. Othman and many other Muslim women who cover view wearing the hijab as a mandatory aspect of Muslim identity and faith to fulfill the commandments of modesty and devotion.  The practice of covering entails wearing one's hijab—a headscarf that covers one's hair, ears, neck and part of one's chest but leaves the entire face exposed—at all times, whether at home or in public, when in the presence of men who are not part of one's immediate family ("mahram").

13.     The hijab is core to Ms. Othman's identity.  It is an essential part of who she is.

14.     Being forced to remove one's hijab in public—like in a police precinct—particularly in the presence of men who are not one's mahram, is a profound defilement of the wearer's sincerely held religious beliefs and a violation of her religious practice.  Forcing the public removal of a hijab is a comparable experience to a strip search.

15.     Until her arrest, Ms. Othman had never had any interaction with law enforcement.

### The NYPD Has a Practice of Surveilling and Falsely Arresting Muslims

16.     While Ms. Othman had not interacted with the NYPD before her arrest, in some ways she was an exception for Muslims in New York.

17.     It is now public knowledge that, since at least 2002, in conjunction with the Central Intelligence Agency ("CIA"), the NYPD has engaged in the religious profiling and suspicion-less surveillance of Muslims.[1]  For instance, the NYPD mapped neighborhoods predominantly occupied by 28 "ancestries of interest" (national origins associated with Muslim populations) and "American Black Muslims"[2]—and specifically excluded non-Muslims like Coptic Christians and Iranian Jews from their surveillance.[3]  It surveilled mosques to record worshippers and recruited "mosque crawlers" to record and report on mosques from the inside,[4]

---

[1]  *Factsheet: The NYPD Muslim Surveillance Program*, AMERICAN CIVIL LIBERTIES UNION ("ACLU") (June 17, 2013) https://perma.cc/ZMJ9-84WG; Matt Apuzzo & Adam Goldman, *With CIA Help, NYPD Moves Covertly in Muslim Areas*, PULITZER (Aug. 24, 2011), https://perma.cc/Y3W8-W39E.

[2]  *The Demographics Unit*, NYPD, https://perma.cc/PQ27-N35X (last accessed Aug. 12, 2024).

[3]  *Factsheet: The NYPD Muslim Surveillance Program*, *supra* n. 1.

[4]  *The Demographics Unit*, *supra* n. 2; *see also* Matt Apuzzo & Adam Goldman, *NYPD Gathered Intelligence on 250-Plus Mosques, Student Groups in Terrorist Hunt*, PULITZER (Nov. 6, 2011), https://perma.cc/XFT2-A9JF; Matt Apuzzo & Adam Goldman, *Inside the Spy Unit the NYPD Says Doesn't Exist*, PULITZER (Aug. 21, 2011), https://perma.cc/6EEF-7PSM.

with an ultimate goal of having an informant in every mosque within 250 miles of the City.[5]
And it sent plainclothes officers called "rakers" to blend into Muslim communities "consistent
with their ethnicity and or language" to compile information, eavesdrop, and identify Muslim
"hotspots."[6]

18.     One unit of the NYPD Intelligence Division, the Citywide Debriefing Team, went
to precincts and jails to question individuals with Muslim or Arab backgrounds who had been
arrested, even if only for low-level offenses like traffic violations—as well as individuals present
in the station to file complaints—about their community and their religious or political beliefs.[7]

19.     While Muslim arrestees were detained in a station house cell or lockup facility,
waiting to be arraigned, the Citywide Debriefing Team would pull them aside into a separate
room and question them regarding their religious habits.  The detectives also gathered
information about arrestees' families, including the names and ages of their children.  The
detectives offered to reduce or even drop the charges against Muslim arrestees if they knew of
other Muslims engaged in criminal or terrorist activity, or if they were willing to spy on other
Muslims for the police.  The ten investigators on the squad conducted upwards of 1,000
interviews in only two years.[8]

_____

[5]  MATT APUZZO & ADAM GOLDMAN, ENEMIES WITHIN: INSIDE THE NYPD'S SECRET SPYING
UNIT AND BIN LADEN'S FINAL PLOT AGAINST AMERICA 129 (2013).

[6]  *The Demographics Unit*, *supra* n. 2; Apuzzo & Goldman, *Inside the Spy Unit the NYPD Says
Doesn't Exist*, *supra* n.4.  Where possible, the NYPD sought to use Muslim recruits who had
applied to be police officers but had yet to go through the academy or be formally trained as a
police officer to increase the chances they could blend in.  ENEMIES WITHIN 130, *supra* n. 5.

[7]  CREATING LAW ENFORCEMENT ACCOUNTABILITY & RESPONSIBILITY ("CLEAR"), MUSLIM
AMERICAN CIVIL LIBERTIES COALITION ("MCLC"), & ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND ("AALDEF"), MAPPING MUSLIMS: NYPD SPYING AND ITS IMPACT ON
AMERICAN MUSLIMS 11 (2013), https://perma.cc/CLY7-W9EX ("MAPPING MUSLIMS").

[8]  Joseph Goldstein, *New York Police Recruit Muslims to be Informers*, N.Y. TIMES (May 10,
2014), https://perma.cc/BEV3-QSNH.

20.    The NYPD justified its practices as necessary for counterterrorism based on the false and unconstitutional premise that Muslim religious beliefs and practices are sufficient basis for suspicion and, therefore, law enforcement action.  For instance, the NYPD contended that wearing traditional Islamic clothing, donning a hijab, growing a beard, becoming involved in social activism and community issues, or abstaining from drinking, cigarettes, and gambling were all "typical signatures" of violent radicalization and merited close police surveillance.[9]  At bottom, the NYPD treated Muslim religious identity as a proxy for criminality.

21.    And it was all for nothing.  The NYPD has acknowledged that its surveillance generated no leads and triggered no terrorism investigations.[10]  The NYPD was targeting and surveilling innocent Americans whose only "crime" was being Muslim.

22.    The NYPD's Muslim Surveillance Program led to multiple lawsuits.[11]  One case brought by Muslim New Jerseyans subjected to the NYPD's surveillance, *Hassan v. City of New York*, went before the Third Circuit, who described the NYPD's actions as little different than the treatment of "Jewish-Americans during the Red Scare, African-Americans during the Civil Rights Movement, and Japanese-Americans during World War II."  804 F.3d 277, 309 (3d Cir. 2015).

23.    Although the NYPD alleges that it has changed its practices, reports as recent as 2021 suggest that the NYPD continues to surveil mosques and falsely arrest Muslims despite

---

[9]  MAPPING MUSLIMS, *supra* n. 7, at 13.  But the "signatures" were also inherently contradictory—Americanizing an Arabic last name could be a sign of radicalization, but so could taking a more Arabic last name; watching Al Jazeera could be a sign of radicalization, but so could not watching Al Jazeera.  ENEMIES WITHIN 132–36, *supra* n. 5.

[10]  Adam Goldman & Matt Apuzzo, *NYPD Muslim Spying Led to No Leads, Terror Cases*, ASSOCIATED PRESS (Aug. 21, 2012), https://perma.cc/9W2V-8EFT.

[11]  *See, e.g.*, *Second and Final Judge Approves Settlement on NYPD Muslim Surveillance*, ACLU (Mar. 21, 2017), https://perma.cc/EVQ5-8XS5.

documentary evidence that no crime has been committed, requiring the district attorney to later drop all charges.[12]

***The NYPD Subjected Ms. Othman to a 24-Hour Nightmare***

24.    January 5, 2023 began as an ordinary day.  Ms. Othman got her children ready for school, and, at 6:20 AM, she left her house to go to work.

25.    Less than twenty minutes later, she received a call from her children that police officers were at their house with a picture of her license.  Her children had confirmed to the police that she lived there, and the police were now demanding that Ms. Othman return home. The officers did not have an arrest warrant.

26.    Ms. Othman arrived home to see several plainclothes officers outside her house in two unmarked police cars.  The officers told Ms. Othman they wanted to speak to her about an incident that occurred in Midtown South.  Ms. Othman tried to tell the officers that she does not go to Manhattan.

27.    One of the officers brought his face so close to hers that it was touching and demanded that she get into the car to go with them, threatening that they would "make a scene" if she did not.  Ms. Othman got into the car.

28.    When they arrived at the Midtown South Precinct, the officers handcuffed Ms. Othman.  She began to sob.

29.    Ms. Othman asked what this was about, and they told her they did not know.

---

[12]  Rebecca Chowdhury, *Outrage Over an Arrest Leads Mosque to Reevaluate Relationship with NYPD*, DOCUMENTED NY (Aug. 29, 2022), https://perma.cc/286U-YLGC; *Ahmed v. City of New York*, 22-cv-8007, Doc. 1 (Compl.) (S.D.N.Y. Sept. 20, 2022).

30.     Upon entering the police station, the arresting officers pointed out a man inside as the investigating detective assigned to Ms. Othman's case.  That detective, who did not give Ms. Othman his name, put her in a jail cell within the precinct and left her there.

31.     About an hour later, the detective returned and took pictures of Ms. Othman on his cell phone.  He refused to answer any questions about why the NYPD had arrested and jailed her.

32.     Ms. Othman's son and son-in-law came to the precinct to try to find out what was happening.  No one would tell them.  Instead, one officer told her son to go home because Ms. Othman would be in custody "a while."

33.     Hours later, another officer pulled Ms. Othman out of the jail cell and took her to an interrogation room.  There, he and another man told Ms. Othman they were detectives who traveled between precincts talking to first time arrestees like Ms. Othman.  They, too, refused to answer any questions about why Ms. Othman had been arrested and jailed.

34.     The detectives told Ms. Othman, "help us help you," and asked questions about her family members.  The detectives insisted that she must know people who are in trouble and could inform them about those people.

35.     They also asked Ms. Othman for details about herself and what she "does for fun" but were dissatisfied when Ms. Othman said that she was a mother of six and their sole provider, meaning she spent practically all of her time either working or at home with her children.

36.     As one of the detectives was taking Ms. Othman back from the interrogation room to the jail cell, he stopped her and asked if she knew anyone by the name of Darwish Darwish.  This was the first time Ms. Othman had heard that name, by the police or otherwise, and she told the detective so.  As that detective put Ms. Othman back into the jail cell, he told her that if she

changed her mind about telling them about Darwish, she should call him because then he could "help" her.

37.     After another few hours, the investigating detective returned and booked Ms. Othman for grand larceny.  Ms. Othman sobbed.

38.     Officers told Ms. Othman that she had been picked out of a photo line-up.  Ms. Othman asked how the police had gotten her photo for purposes of the line-up, given that she had never been arrested before and therefore had never had a mugshot until that day.  The NYPD never explained then, and have never explained since, how or why they detained Ms. Othman.

39.     After officers returned her to the jail cell, Ms. Othman needed to use the bathroom, but officers told her that she was not permitted to close the door, and a male officer watched the bathroom.  As a result, Ms. Othman did not attempt to use the bathroom again.

40.     Ms. Othman was held at the precinct from 9:30 AM to almost midnight, but at no point was she given so much as a sip of water, let alone a meal.  In fact, at one point late in the day, there were two other women in Ms. Othman's cell, and the police gave one cigarettes and gave both of the other women a meal from McDonald's, but they gave Ms. Othman nothing. Rather, when one of the other women asked the officers to give Ms. Othman some of the fries, the officers threw the food into the trash instead of permitting Ms. Othman to eat.

41.     Around midnight, the investigating detective told Ms. Othman that she was being transported to Central Booking.  The investigating detective had taken Ms. Othman's Apple watch and phone when she arrived at the precinct and, in preparation for transport to Central Booking, he gave her a ticket reflecting that the property had been seized.  He did not take Ms. Othman's jewelry and remarked that Ms. Othman was "lucky" that he was letting her keep her it. She was wearing what she had worn to work—a brand new vest with a drawstring hood, shoes

with laces, and personal jewelry that she had not removed for more than three decades: an
engagement ring, a wedding band, and diamond earrings.

42.     When she arrived at Central Booking, one officer demanded Ms. Othman remove
her hijab.  She responded she could not remove it because she wore it for religious reasons, and
there were many men in sight.  But the officer was insistent: "I don't need problems.  Just take it
off," he told her.

43.     Ms. Othman was not given any option to keep her hijab on when being processed
and having her booking photo taken.

44.     During this exchange, one of the men to whom Ms. Othman was shackled also
told the officers that Ms. Othman could not remove her hijab and began loudly demanding that
the officers permit Ms. Othman to keep on her hijab.

45.     Over Ms. Othman's and the arrestee's protestations, multiple male officers took
Ms. Othman into a separate room to take her booking photo, where a female officer insisted Ms.
Othman remove her hijab for the photo.

46.     When Ms. Othman removed her hijab, the officer saw Ms. Othman still had on
jewelry, as well as a drawstring in her vest and laces in her shoes.  The female officer in the
room yelled that Ms. Othman was not permitted to have these items.  She shouted at the other
officers for letting Ms. Othman retain those items and called a male officer into the room.

47.     Ms. Othman did not have her hijab on when the male officer was in the room, as
she had been made to remove it for the booking photo and could not access her earrings while
wearing it.  She felt violated by the hijab removal and was crying on and off because of it.

48.     The male officer took Ms. Othman's earrings, rings, vest, and shoelaces and left.
The NYPD did not provide her a new ticket for the additional property it took from her.

49.     The demand for Ms. Othman to remove her hijab for her booking photo was in direct contravention to the NYPD's policy.  The NYPD policy ("the Policy"), enacted pursuant to an October 26, 2020 stipulated court order, provides that the arresting officer must take booking photographs of arrestees "with [the] religious head covering in place," and those head coverings may be moved only to expose the oval of the face, which the policy describes as the "individual's forehead, eyes, nose, mouth, chin and jawline." [13]

50.     The Policy explicitly provides that an "[a]n uncovered photograph will NOT be taken unless (a) [t]here is reasonable suspicion that the arrestee has a distinguishing feature not otherwise fully visible with head covering in place . . . that is of investigative value to the current investigation or arrest, or (b) [t]here is reasonable suspicion that the arrestee committed the crime outside their residence while not wearing a head covering."  In all other circumstances, requiring an arrestee to remove their head covering for a booking photograph is prohibited. [14]

51.     In *only* those limited circumstances, if an uncovered photograph must be taken, "the prisoner MUST be transported to the appropriate borough court section, where the photograph will be taken in a private area by a member of the service of the same gender."  The uncovered photograph should then be tagged in the database to "limit[] the permissible uses of the photograph." [15]

---

[13]  NYPD, *Arrests - Religious Head Covering Guidelines, in* Patrol Guide, 351–54, https://perma.cc/8AM7-7N9P. (last accessed Aug. 9, 2024) ("NYPD Religious Head Covering Policy").

[14]  NYPD Religious Head Covering Policy at 351–52 (emphasis in original).

[15]  *Id.* at 352–53.

52.     The Policy also notes that "[e]very effort should be made not to prolong detention beyond what is necessary in order to take an official Department photograph while accommodating prisoners' sincerely held religious beliefs."[16]

53.     The NYPD failed to abide by the Policy in several respects when booking Ms. Othman:

      a.   Ms. Othman was made to remove her hijab for her booking photo, even though there was no reasonable suspicion she had distinguishing features under her hijab, nor that she committed any alleged crime without her hijab.

      b.   The uncovered photo was not taken in a private area.

      c.   A male officer was present.

      d.   The uncovered photograph was not restricted in its dissemination.

      e.   Ms. Othman's detention was prolonged.

54.     Ms. Othman was then put into a crowded jail cell.  It was chaos.  Other people were screaming, cursing, and kicking.

55.     While at Central Booking, Ms. Othman felt light-headed and was afraid she would faint after having gone 24 hours without any food or water.  Only later the following morning did an officer at Central Booking give Ms. Othman anything to eat before they took her to court, and even then it was limited to a few pieces of stale cereal.

56.     Throughout the time that Ms. Othman was held at the Midtown South Precinct and then at Central Booking, she also was unable to pray and therefore missed all five daily prayers.  To this day, she feels horrible and heartbroken about having missed her prayers.

---

[16] *Id.*

57.    Around 10 AM on January 6, 2023, Ms. Othman was taken to court to be arraigned.  In the courtroom, she could see male officers with copies of her booking photo without her hijab.  Ms. Othman was devastated and felt violated: "That's thirty years of wearing it thrown away."

58.    Ms. Othman's daughter had been able to arrange for an attorney to come to the arraignment.  At the hearing, Ms. Othman was given a new court date to return and was released.

### The Factual Allegations Forming the Charges Against Ms. Othman Were Implausible on their Face

59.    The charging documents Ms. Othman received at the hearing stated that she was being charged with grand larceny in the fourth degree and petit larceny.

60.    As factual basis for the charges, Detective Huascar Morell of the Midtown South Precinct swore:

> I am informed by an individual known to the District Attorney's Office (Informant 1), that [on September 18, 2022 at about 1:50 PM, in front of 414 8th Avenue] he got into a white SUV car that he mistakenly believed was his Taxi had he had ordered.  Upon entering the vehicle, he saw separately-charged defendant Darwish Darwish driving the vehicle (M22649389) and the defendant, Deena Othman, in the back seat, along with two children.  I am further informed by Informant 1 that Darwish Darwish stated to him that the individuals in the car were his family, and stated "I want to give you a gift," and began handing him jewelry.  I am further informed by Informant 1 that while Darwish was doing so, Deena Othman was reaching into Informant 1's pocket, and touching his wrist.  He then observed Deena Othman take his Rolex watch off his wrist.
>
> I was informed by Informant that he did not give anyone permission or authority to take or possess his Rolex watch.

61.    Even when Ms. Othman and her attorney requested the identity of the informant who was the purported victim, the police and prosecutor refused to provide it.

62.    Additionally, no one ever explained how Ms. Othman was purportedly related to Darwish, who the purported children in the car were, why the purported informant-victim

believed the SUV was his taxi or why he stayed in the car after realizing it was not, what jewelry Darwish allegedly gave to the purported informant-victim or why, nor why the purported informant-victim allowed Ms. Othman to remove his wristwatch without complaint.

63.    Coincidentally, after having secured Ms. Othman's release, her attorney determined that he had previously represented Darwish in connection with the same incident. Darwish had been arrested the week before Ms. Othman, on December 28, 2022, for the September 18, 2022 purported larceny.  But the police had been forced to release Darwish because he had not been in the country on September 18, 2022, as his passport stamps proved.

64.    Despite knowing that Mr. Darwish was not in the United States during the purported crime, the NYPD used that narrative—which they knew was false—as a premise to arrest Ms. Othman.

65.    Ms. Othman had video evidence that she had been in Patterson, New Jersey with her daughter on September 18, 2022—not committing larceny in an SUV in Manhattan.  Her youngest child was a teenager.  She had no children as young as those the purported informant-victim had described in the backseat of the SUV.

66.    Instead of dismissing the charges against Ms. Othman, however, the City called Ms. Othman's attorney in February to ask that Ms. Othman provide the names and ages of her children and state whether any of them wear a hijab.  Thinking of her own nightmarish experience with the police, Ms. Othman was hesitant to turn any information about her family over to law enforcement.  At the advice of her attorney, however, she provided the prosecutor the requested information.

67.    A few days after providing details on her children and their religious practices, on February 8, 2023, the charges were officially dismissed.

***The Arrest Continued to Haunt Ms. Othman Long After Her Release***

68.    For the month that the charges against Ms. Othman were pending, the Department of Education put Ms. Othman on unpaid suspension.

69.    While suspended, Ms. Othman—and therefore her children—lost health insurance.  One of her daughters broke her foot in January 2023 but, because of the loss of insurance, she was forced to keep the cast on her foot for several weeks longer than had been prescribed, causing considerable pain.  Moreover, rather than being able to go to the doctor, her daughter had to go to the emergency room for treatment.

70.    After her arrest, Ms. Othman has begun to suffer panic attacks but, without insurance, she was unable to seek treatment.

71.    Her suspension also meant that the family had no income for a month.  Ms. Othman had to borrow money from her brother to pay her attorney's $5,000 fee and borrow additional money from her sister for food.

72.    Although Ms. Othman sought back pay for the time she was suspended once the charges against her were dropped, she received only a portion of what she had lost.  She was never paid several hundred dollars that she would have received had she not been falsely arrested.

73.    Once the charges against her were dropped, Ms. Othman sought to retrieve her property from the police.  Traumatized by the incident, she did not want to return to the Midtown South Precinct but had no other choice.  The officers at the precinct, however, told her that there was a ticket only for her phone and watch, but not for her vest or jewelry, and whatever property the police had was at One Police Plaza.  Ms. Othman went to One Police Plaza and retrieved her phone and watch, but officers there told her that her jewelry had already been picked up, and she

needed to go back and speak with the precinct.  She returned to the precinct, but the officers told her that they did not have her jewelry or vest.

74.     Ms. Othman filed a complaint with Internal Affairs on February 10, 2023 concerning her missing property.  Two officers came to her house and showed her photos of the property the police had taken from her, including the jewelry.  They stated, however, that even though the jewelry had been documented, they did not know where it was now.  On May 5, 2023, Internal Affairs sent Ms. Othman a letter indicating that disciplinary action had been recommended against an officer in response to her complaint.

75.     To date, Ms. Othman's wedding ring, wedding band, earrings, and vest have still never been returned to her.

### Ms. Othman Suffered and Continues to Suffer Emotional and Physical Harm from the NYPD's Treatment

76.     Ms. Othman is deeply traumatized from what she experienced in NYPD custody. Every time she remembers what happened to her, her heart rate accelerates, she cannot breathe, and she begins to cry.

77.     Ms. Othman also bears the emotional weight of knowing how this impacted her family.  When the police took Ms. Othman on January 5, 2023, her children had been left that day without anyone to care for them, and her younger, school-age children had not been able to go to school.  And in the middle of that emotional turmoil, her children had to scrounge together money to pay for an attorney and try to arrange for Ms. Othman to come home.  On January 5, 2023, when Ms. Othman was in jail, all six children crowded into the living room of their home and cried together, frightened by the experience of having their mother snatched from them without explanation and unsure when she may come back home.

78.     The experience is never far from her thoughts, and she finds herself frequently thinking about the trauma of the arrest and incarceration.  She cannot forget the disdain with which the officers treated her, and she can still hear the clamor and banging of the jail cells where she was held.

### FIRST CAUSE OF ACTION
The Religious Land Use and Institutionalized Persons Act
(42 U.S.C. § 2000cc)
Against City of New York

79.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

80.     Congress enacted the Religious Land Use and Institutionalized Persons Act to demonstrate the robust national commitment to the free exercise of religion and to prohibit the government from placing a substantial burden on religious beliefs.  This legislation, which reflects an increased awareness of and support for religious interests in practices like prayer and religiously compliant meals, "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution."  42 U.S.C. § 2000cc-3(g). The statute even "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."  *Id*. § 2000cc-3(c).

81.     In contravention of this longstanding legislation and the tolerant, inclusive policies it embodies, NYPD officers repeatedly refused to accommodate Ms. Othman's religious practice while she was in custody.

82.     RLUIPA provides, in relevant part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person- (1) is in furtherance

of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2).

83.    Plaintiff is a "person[]" as defined under the RLUIPA. *See* 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3).

84.    Plaintiff's decision to wear hijab constitutes a sincerely held religious belief.

85.    At all relevant times, the City met the definition of the term "government" under the RLUIPA.  *See* 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

86.    At all relevant times, Plaintiff was in NYPD custody.  The locations where Plaintiff was detained including, but not limited to the NYPD Midtown South Precinct, Central Booking, and courthouse ("the City Institutions"), where the events alleged in the complaint transpired, are federally funded "institutions" as defined under the RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997(1)(B)(ii)-(iii).

87.    At all relevant times, Plaintiff was "residing in or confined to institutions" as defined under the RLUIPA when the events alleged above transpired.

88.    The City's acts or omissions, policies, and customs substantially burdened Plaintiff's religious exercise by requiring her to remove her hijab to be photographed while she was residing in or confined to City Institutions.

89.    The City's acts or omissions, policies, and customs do not further a compelling government interest.

90.    The City's acts or omissions, policies, and customs are not the least-restrictive means of furthering a compelling government interest.

91.     As a direct and proximate result of The City's wrongful acts and omissions, Plaintiff has sustained damages, and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

## SECOND CAUSE OF ACTION
Fourth Amendment
(42 U.S.C. § 1983)
Against All Defendants

92.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

93.     The NYPD wrongfully and illegally detained and arrested Plaintiff.

94.     The NYPD's arrest was carried out without any basis, without Plaintiff's consent, and without probable cause or reasonable suspicion.

95.     Among other things, one week before arresting Plaintiff, the police and prosecutors already knew that significant portions of the purported informant-victim's narrative of the allegedly criminal events of September 18, 2022 were false, given that Plaintiff's purported co-conspirator, Darwish, had already established that he was out of the country at the time.

96.     The stated factual narrative of the alleged larceny was also implausible on its face.

97.     Moreover, the questioning by detectives during Plaintiff's detention concerning her family, who the police insisted were involved in criminal activity, and their questions after her release about the religious practices of her children suggest religious targeting consistent with that of the Citywide Debriefing Team.

98.     No reasonable officer would have believed there was probable cause to arrest Plaintiff under these circumstances.

99.     The foregoing violations of Plaintiff's Fourth Amendment constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct chargeable to Defendants, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are arrested by the NYPD.

100.     The City failed to provide adequate training or supervision to subordinate officers to such an extent that it amounts to deliberate indifference to the rights of persons, including Plaintiff, who come in contact with NYPD officers.

**THIRD CAUSE OF ACTION**
*Gerstein* and Fourth Amendment
(42 U.S.C. § 1983)
Against All Defendants

101.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

102.     The Fourth Amendment requires that a warrantlessly arrested individual be provided "a prompt judicial determination of probable cause" once the administrative steps incident to arrest are completed.  *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

103.     Although jurisdictions are immune from systemic challenges where judicial determinations of probable cause are provided within 48 hours of arrest, even a shorter period of detention before a judicial determination may still violate the arrestee's Fourth Amendment rights where such determination was "delayed unreasonably."  *Id.* at 56.  "Examples of such delay include 'delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.'"  *United States v. Pabon*, 871 F.3d 164, 178–79 (2d Cir. 2017) (quoting *Riverside*, 500 U.S. at 56). Indeed, under this framework, even detentions of as little as eight hours may plausibly be

unreasonable delays violating an arrestee's Fourth Amendment rights.  *See Torres v. City of N.Y.*,
No. 21-cv-10832 (LAK), 2023 U.S. Dist. LEXIS 59390, at *13-15 (S.D.N.Y. Apr. 4, 2023).

104.    Plaintiff was detained for 18 hours before being booked.  She was detained an
additional six hours thereafter.  In total, Plaintiff was detained for over 24 hours before being
provided a probable cause hearing.

105.    During that more than 24-hour detention, police officers detained her for purposes
of gathering information about her family, who they insisted must be involved in criminal
activity of some kind, and questioning Plaintiff regarding her and her family's religious
practices.

106.    Officers also refused to feed Plaintiff or give her anything to drink, even throwing
away food given to other arrestees rather than giving any to Plaintiff.

107.    Officers refused to permit Plaintiff to observe her religious practices during her
detention, including prayer and wearing hijab.

108.    Plaintiff's probable cause hearing was delayed, and such delay was for purposes
of gathering additional evidence to justify her arrest, motivated by ill will against Plaintiff, and
was delay merely for delay's sake.

109.    Defendants' acts or omissions, policies, and customs violated Plaintiff's Fourth
Amendment rights.

110.    As a direct and proximate result of Defendants' wrongful acts and omissions,
Plaintiff has sustained damages, and has suffered and continues to suffer mental anguish,
physical and emotional distress, humiliation, and embarrassment.

111.    The foregoing violations of Plaintiff's Fourth Amendment constitutional rights
and injuries were further directly, foreseeably, proximately, and substantially caused by conduct

chargeable to Defendants, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are arrested by the NYPD.

112.    The City failed to provide adequate training or supervision to subordinate officers to such an extent that it amounts to deliberate indifference to the rights of persons, including Plaintiff, who come in contact with NYPD officers.

***

WHEREFORE, Plaintiff Deena Othman respectfully requests judgment against Defendants as follows:

a) Awarding such damages to Plaintiff as will fully compensate her for her loss of rights and emotional distress suffered due to Defendants' unlawful conduct;

b) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

c) Granting Plaintiff such other further relief as may be just and proper.

Dated: New York, New York
        October 22, 2024

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____/s/_____

O. Andrew F. Wilson
Hafsa S. Mansoor
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Deena Othman*